# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: September 09, 2020

Mr. Nathan G. Peplinski
Mr. Michael F. Schmidt
Harvey Kruse
1050 Wilshire Drive
Suite 320
Troy, MI 48084

Mr. A. Tony Taweel
Ottenwess, Taweel & Schenk
535 Griswold Street
Suite 850
Detroit, MI 48226

Re: Case No. 19-1994, *O. Matthews v. Harleysville Lake States Ins.*
Originating Case No. : 2:18-cv-11659

Dear Counsel,

  The Court issued the enclosed opinion today in this case.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc: Mr. David J. Weaver

Enclosure

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0524n.06

No. 19-1994

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |
|---|---|
| O.L. MATTHEWS, M.D., P.C.,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>HARLEYSVILLE INSURANCE CO.,<br><br>    Defendant-Appellee. | **FILED**<br>Sep 09, 2020<br>DEBORAH S. HUNT, Clerk<br><br>ON APPEAL FROM THE<br>UNITED STATES DISTRICT<br>COURT FOR THE EASTERN<br>DISTRICT OF MICHIGAN |

BEFORE: GRIFFIN, THAPAR, and READLER, Circuit Judges.

GRIFFIN, Circuit Judge.

This insurance coverage dispute concerns damage to a building that resulted from rainwater ponding on the roof and eventually finding its way inside. The issue on appeal is whether the damage is covered under the relevant policy or excluded by one or more of its numerous "exclusions" or "limitations." OLM, the insured, argues that the district court applied the wrong standard of causation when it analyzed whether one of the Policy's coverage exclusions applied. OLM is correct on this point, but we conclude that two other provisions of the Policy (one "exclusion" and one "limitation") apply to bar coverage. We therefore affirm.

I.

Plaintiff O.L. Matthews, M.D., P.C. ("OLM") owned a building in Inkster, Michigan and used it as a medical office. OLM bought the building in the early 1980s, and for many years,

No. 19-1994, *O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*

neither OLM nor its owner, Dr. O.L. Matthews, paid much attention to the condition of the roof. That changed in January of 2017, when the roof started leaking. OLM filed a claim under the "Businessowners policy" ("the Policy") it held with defendant Harleysville Insurance Company, but Harleysville denied coverage and its agent told OLM that the roof needed maintenance.

OLM then hired Darrell Wood, a roofer, but because of the ice and snow on the roof—typical for January in Michigan—he could not perform the full, necessary maintenance. So Wood performed what maintenance he could under the then-existing weather conditions. A similar sequence of events occurred in February 2017. OLM hired Wood to return because of another leak and he performed limited maintenance due to the ice and snow. Wood characterized the condition of the roof as "messed up." When he first climbed up to the roof, it was "all water," "like a lake." Some areas were sagging and the drain wasn't working properly. In short, "[e]verything was bad on the roof." Wood described his temporary fix—draining the water and patching some areas with roof tar—as "put[ting] a Band-Aid on a damaged roof."

By July of 2017, the weather had improved and OLM hired a different roofer, who provided some maintenance to the roof. Then in August, OLM hired King's Roofing to provide additional maintenance and prepare the roof for the following winter. Andrew Yonko, the owner of King's Roofing, examined the roof and described it as being in "okay condition, but it needed work done. Definitely needed maintenance." He observed water ponding on the roof in "low spots" and that seams in the waterproof membrane were "starting to blister up . . . [and] crack up." Yonko explained that the weight of water ponding on a roof tends to "pull[ ] apart" a roof membrane, and that seams will deteriorate because of normal "wear and tear." He estimated that the lifespan of a roof like the building had would typically be between fifteen and twenty years. By the summer of 2017, the roof at issue here was at least thirty-five years old.

No. 19-1994, *O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*

King's Roofing gave OLM an estimate to repair the roof, which OLM approved. But before King's could begin its work, water leaked into the building and caused significant damage to the inside, including the light fixtures, the carpeting, and even the door locks. King's eventually repaired the roof, but the damage was done. OLM promptly filed a second claim with Harleysville, which hired David Walenga, a structural engineer, to investigate and determine the "cause of loss." Walenga examined the roof in October 2017 and reached three major conclusions. First,

> Moisture is intruding into the subject building due to the exploitation of breaches in the roof from latent defects and a lack of proper and timely maintenance or repair. The roof lacks sufficient pitch or drainage to prevent ponding. Ponded moisture is capable of intruding into the building via defects such as failed or weak membrane seams, and failed penetration flashings.

Second, based on the corrosion of metal in the ceiling and damage to the ceiling tiles, "[m]oisture ha[d] been intruding into the subject building to some degree for a duration well exceeding the timeframe between the claimed loss period, and [the] inspection date." Third, Walenga found "no indication that the roof ha[d] been displaced or damaged by a singular weather-related event, such as wind." Weather records showed no severe or high wind speeds during the loss period, and the previous repairs to the roof indicated gradual deterioration over a long period rather than a single, severe event.

Relying on Walenga's report, Harleysville concluded that "loss was caused by the exploitation of breaches in the roof from latent defects and a lack of proper and timely maintenance or repair" and that the Policy "does not provide coverage for this loss." Accordingly, Harleysville denied OLM's second claim in December 2017. A letter communicating the denial identified several exclusions in the Policy that, according to Harleysville, applied to preclude coverage.

Meanwhile, OLM hired its own expert to examine the roof, structural engineer Michael T. Williams. For the most part, his conclusions were consistent with Walenga's:

-3-

- The roof deck . . . is failing.  The more it sags, the more water is ponded every time it gets wet.  The more water is ponded in the low spots, the more it sags.  With this continued cycle of progressive failure of the deck, the entire deck must be replaced.
- The roof system has been repaired many times. The repairs have also added to the weight of the roof.  The additional weight plus the standing water caused by the deck sags has overcome the roof deck's ability to carry such loads.
- The weight of the ponded water stretches the roof membrane. This stretching is a "tensile" loading.  The weakest parts of the roof membrane are its seams or its transition areas where it is wrapped over or around something.  Those are the areas where the roof system has failed[.]

Williams characterized the rainfall that led to the damage to the building in August 2017 as the "straw that broke the camels' [sic] back," as "several areas . . . failed and could no longer support the weight of the roof and the ponded water."

OLM believed the damage to the building was covered under the Policy and filed suit against Harleysville in Michigan state court, asserting a single count of breach of contract under Michigan law.[1]  Following removal and discovery, Harleysville moved for summary judgment, arguing that several "exclusions" or "limitations" contained in the policy precluded coverage for the damage to the building.  The district court agreed, granted the motion, and entered judgment in favor of Harleysville.  *O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*, 412 F. Supp. 3d 717 (E.D. Mich. 2019).  OLM timely appealed.

II.

"We review de novo a district court's grant of summary judgment."  *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if the evidence permits a reasonable

---

[1]The complaint incorrectly identified Harleysville as "Harleysville Lake States Insurance Company."

-4-

No. 19-1994, *O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*

jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Viewing the evidence in a light most favorable to the nonmoving party, our task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

Here, the parties agree as to the relevant facts, and this appeal turns on a legal issue: the interpretation of an insurance policy. "An insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Heath v. State Farm Mut. Auto. Ins. Co.*, 659 N.W.2d 698, 699 (Mich. Ct. App. 2002) (per curiam). In doing so, "we look[ ] to the contract as a whole." *Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 841 (Mich. 1997). "If the insurance contract sets forth definitions, the policy language must be interpreted according to those definitions. If a term is not defined in the policy, it is to be interpreted in accordance with its commonly used meaning." *Heath*, 659 N.W.2d at 699 (citation omitted). If a contract is unambiguous, it is "not open to judicial construction and must be enforced as written." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005) (emphasis omitted).

"Interpretation of an insurance policy ultimately requires a two-step inquiry: first, a determination of coverage according to the general insurance agreement and, second, a decision regarding whether an exclusion applies to negate coverage." *Harrington*, 565 N.W.2d at 841. "Under Michigan law, an insured loses coverage under a policy if one of the policy's exclusions applies to the insured's particular claims." *Seaway Cmty. Bank v. Progressive Cas. Ins. Co.*, 531 F. App'x 648, 651 (6th Cir. 2013) (citing *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431,

-5-

No. 19-1994, *O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*

434 (Mich. 1992)). "Exclusionary clauses in insurance policies are strictly construed in favor of the insured," *Churchman*, 489 N.W.2d at 434, but "[c]lear and specific provisions that limit coverage must be given effect because an insurance company cannot be held liable for a risk that it did not assume." *Jervis Webb Co. v. Everest Nat. Ins. Co.*, 650 N.W.2d 722, 725 (Mich. Ct. App. 2002).

Here, the Policy provides that Harleysville "will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." "Covered Property" includes the building in question here. And the Policy defines "Covered Causes of Loss" as [r]isks of direct physical loss unless the loss is" either "excluded" in the Policy's list of exclusions or "limited" in its separate list of limitations. OLM repeatedly emphasizes that the Policy is an "all-risk" insurance policy. "An 'all-risk' policy creates coverage of a type not ordinarily present under other types of insurance, and recovery is allowed for fortuitous losses unless the loss is excluded by a specific policy provision." 10A Steven Plitt et al., *Couch on Insurance* § 148:50 (3d ed. 2019). But an "all-risk" policy does not cover every risk; a court must carefully examine the policy's exclusions and limitations to determine whether a particular loss is covered.

Thus, this case turns on whether at least one of the Policy's exclusions or limitations applies to bar coverage for the water damage to the building. Three are at issue here. We take them one at a time.

A.

The Policy excludes from coverage "loss or damage caused by or resulting from":

Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

-6-

>   (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>
>   (3) Materials used in repair, construction, renovation or remodeling; or
>
>   (4) Maintenance;
>
>   of part or all of any property on or off the described premises.

Harleysville argues that this "Negligent Work Exclusion" applies because the roof was improperly designed to have the drain situated higher than the rest of the roof. To function properly, a drain needs to be at the *lowest* point to ensure that water flows into it (instead of ponding elsewhere on the roof). According to Harleysville, the drain's placement led to the ponding of water on the roof, which led to the membrane tearing and the damage to the inside of the building.

Expert testimony supports this contention. Williams, OLM's expert, testified that "the drain is set too high," and explained that between the placements of the roof joists and the drain, "the roof deck must support the weight of almost five inches of water before it can discharge into the roof drain." Williams also stated that the weight of the water on the roof was caused by "the bad design of the roof," which included "the bad design of where the drain was." Walenga, Harleysville's expert, stated in his report that "[t]he region surrounding the roof drain is relatively higher than the field of the roof," which "prevents drainage." This is also consistent with the roofers' observations. Wood, the first roofer, couldn't remember how high the drain was, but he did observe that it "wasn't doing anything" and the water "wasn't draining properly." Yonko testified that the drain was "a little high" and admitted that "if the drain is one and three-quarter inches above the roof deck," it was "probably . . . design[ed]" improperly.

OLM offers no evidence to dispute its own expert's statement that the roof's poor design led to the damage to the building in August 2017. In fact, OLM states in its brief that "it is

undisputed that the excluded peril of negligent work (i.e., defective design) caused or set in motion the subsequent covered peril of Water infiltration, which in turn caused water damage." Instead, OLM argues that a different provision—an ensuing-loss clause—in the Policy "serves as an exception" to the Negligent Work Exclusion and thus preserves coverage. Such a "provision provides coverage for specific types of losses that are otherwise covered in the policy when that loss is the result of the occurrence of an excluded peril." 11 Steven Plitt et al., *supra* § 153:70. "For example, a policy may provide that it does not cover any loss caused by earth movement. However, any ensuing loss by fire which is not excluded or excepted is covered. This means the policy covers loss caused by fire that would not have occurred but for the earth movement." *Id.* (footnote omitted). Thus, an ensuing-loss clause may be aptly characterized as an "exception to [an] exclusion." And here, OLM identifies this ensuing-loss clause in the section of the Policy that contains the Negligent Work Exclusion:

> We will not pay for loss or damage caused by or resulting from any of the following Paragraphs [including the Negligent Work Exclusion]. But if an excluded cause of loss that is listed in [this section] results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

OLM argues that the district court erred by ignoring this clause and instead applying Michigan's "default rule" of causation—the "anti-concurrent" causation rule—which holds "that a loss is not covered when it is caused by a combination of a covered risk and an excluded risk." *Iroquois on the Beach, Inc. v. Gen. Star Indem. Co.*, 550 F.3d 585, 589 (6th Cir. 2008). In *Iroquois*, which the district court relied on below, an insurer denied coverage for damage to a building based on the policy's exclusion for continuous water leakage that occurs for longer than two weeks. *Id.* at 587. The insured argued that the exclusion did not apply for two related reasons. First, "windstorms, a covered loss under the policy, initiated the sequence of events that resulted in the

No. 19-1994, *O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*

loss." *Id.* Second, the section of the policy that contained the exclusion did not include an "anti-concurrent, anti-sequential" clause (whereas a different section of the policy did contain such a clause). *Id.* at 587–88.

The insured argued that the court should instead apply "the doctrine of 'efficient proximate cause,'" which "applies when 'two or more identifiable causes, at least one of which is covered under the policy and at least one of which is excluded thereunder, contribute to a single loss.'" *Id.* at 588 (quoting 7 Steven Plitt et al., *supra* § 101.45). "Under this doctrine, '[i]f the cause which is determined to have set the chain of events in motion, the efficient proximate cause, is covered under the terms of the policy, the loss will likewise be covered.'" *Id.* (alteration in original). The court rejected the insured's argument and applied the anti-concurrent causation rule because that was Michigan's default rule and no language in the policy indicated that the parties had contracted out of it. *Id.* at 588–89.

OLM made a similar argument to the district court, which rejected it with a straight application of *Iroquois*. *Matthews*, 412 F. Supp. 3d at 720–23. But the court did not meaningfully engage with OLM's other argument that the Policy's ensuing-loss clause abrogated or modified the default anti-concurrent causation rule.[2] On this point, OLM is correct. Both are rules of causation that, by their terms, cannot coexist side by side. That is, in a situation where a covered cause and a non-covered cause both contribute to a loss, applying the anti-concurrent causation rule would preclude coverage every time, while an ensuing-loss clause would preserve coverage

---

[2]The district court only mentioned in passing that OLM "further asserts that the exclusions listed in Section (B)(3) permit coverage for ensuing loss resulting from the weight of rain ponding on the roof, therefore none of the (B)(3) exclusions are applicable here because the evidence shows that the weight of the ponding water on the roof caused the loss." *Matthews*, 412 F. Supp. 3d at 720.

-9-

in some circumstances. And *Iroquois* does not control here, as the policy there did not contain an ensuing-loss clause or any other contractual provision that would modify the default rule. Because we must "look to the plain language of the insurance policy in determining the scope of coverage," *Busch v. Holmes*, 662 N.W.2d 64, 67 (Mich. Ct. App. 2003), the ensuing-loss clause that appears in the Policy controls, rather than the default anti-concurrent causation rule.

According to OLM, this would play out here as follows. The Negligent Work Exclusion precludes coverage for the damage to the roof (i.e., the sagging, cracking, and eventual breach of the membrane) because it was caused by the defective design of the roof drain. The damage to the roof caused the water leak, which in turn caused the damage to the building's interior. The ensuing-loss clause, the argument goes, preserves coverage for the interior damage because an "excluded cause of loss result[ed] in a Covered Cause of Loss."

The problem for OLM is that ensuing-loss clauses do not necessarily preserve coverage with respect to every exclusion in an insurance policy. We must continue to examine the entire Policy "as a whole," *Harrington*, 565 N.W.2d at 841, including the two other exclusions or limitations identified by the district court.

B.

The Policy excludes from coverage "loss or damage caused by or resulting from":

(1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion[.]

-10-

No. 19-1994, *O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*

"Wear and tear" is defined as "[d]eterioration caused by ordinary use; the depreciation of property resulting from its reasonable use." *Wear and Tear*, *Black's Law Dictionary* 1827 (10th ed. 2014). "Damage resulting from normal 'wear and tear' is often excluded from coverage because it is a[ ] type of nonfortuitous loss." 11 Steven Plitt et al., *supra* § 153:77. Unlike the Negligent Work Exclusion, this "Wear and Tear Exclusion" does not have an ensuing-loss clause. So the default, anti-concurrent causation rule applies, and if wear and tear contributed to the loss, the Policy does not cover it. *See Iroquois*, 550 F.3d at 589.

The following caveat does apply, however: "If an excluded cause of loss [including those that fall within the Wear and Tear Exclusion] results in a 'specified cause of loss' or building glass breakage, [Harleysville] will pay for the loss or damage caused by that 'specified cause of loss' or building glass breakage." The Policy defines "specified cause of loss" as "[f]ire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." The only plausible option among these is "water damage," which the Policy defines as "accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam." Using that definition, the water damage to the building here does not qualify as a "specified cause of loss" under this exception to the Wear and Tear Exclusion because a roof is plainly not a "system or appliance." *See System*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/system (last visited Aug. 25, 2020); *Appliance*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/appliance (last visited Aug. 25, 2020).

-11-

No. 19-1994, *O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*

OLM does not dispute that wear and tear contributed to the damage to the building in this case. In fact, it does not even mention this exclusion in its brief, despite the district court's extensive discussion of it. *See Matthews*, 412 F. Supp. 3d at 719–20. "[W]e will treat an argument as forfeited when it was not raised in the opening brief." *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) (internal quotation marks omitted). Beyond that, after Harleysville filed its brief on appeal arguing that the Wear and Tear Exclusion applied to bar coverage, OLM did not file a reply brief or otherwise make any effort to respond.

Even without the forfeiture, though, there is no genuine dispute that this exclusion applies. The record shows that wear and tear was a cause of the loss here. Yonko testified that the seams on the roof membrane had deteriorated because of "[w]ear and tear." He also stated that a roof like the one on the building should be replaced every fifteen to twenty years. (*Id.*) We know from Dr. Matthews' testimony that the building had the same roof for at least thirty-five years prior to August 2017. Wood identified "a lot of other issues [with the roof] besides the drain," including "lots of little holes," "soft spots," "seams that w[ere] open," and "sagging." Wood further opined that the roof needed to be replaced. Walenga's report stated that the evidence of previous repairs to the roof was "symptomatic of those performed related to deterioration of the roof and attempts to address deferred maintenance." And Williams, OLM's expert, testified that "the wear and tear that [the roof] has received is from the weight of the water pulling the membrane apart."[3]

---

[3]The district court pointed out that "Williams' testimony is difficult to follow," as he also testified that "I wouldn't use the word wear and tear. I'm saying long-term damage to the sheeting." *Matthews*, 412 F. Supp. 3d at 720 n.1. At the end of his deposition, he attempted to clarify: "Normally in construction trades, the term wear and tear refers to ordinary deterioration of a building product based upon exposure to weather-related things and normal aging process. In this instance, the only thing you could characterize as wear and tear, in my opinion, is the tearing and pulling apart of the membrane that was caused by the weight of the water because of the

-12-

No. 19-1994, *O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*

To be sure, a broad interpretation of "wear and tear" combined with the application of the anti-concurrent causation rule could lead to coverage being denied in nearly any situation, even with an all-risk policy. *See Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 352–53 (6th Cir. 2005); *see also Churchman*, 489 N.W.2d at 434 ("Exclusionary clauses in insurance policies are strictly construed in favor of the insured."). But that concern certainly does not arise here, where the roof had outlived its intended life twice over and had been poorly maintained and monitored during that time. Moreover, the Wear and Tear Exclusion is not the only provision of the Policy that bars coverage in this case.

## C.

In the "Limitations" section, the Policy provides that Harleysville "will not pay for loss or damage to":

> (5) The interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:
>
> (a) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or
>
> (b) The loss or damages caused by or results from thawing of snow, sleet or ice on the building or structure.

Again, the relevant facts here are undisputed.[4] OLM admits that there was "severe and pervasive water infiltration and resulting water damage to the interior of the Building from water that had collected on the roof." OLM also states that "the weight of rain that collect[ed] on [the] roof . . . cause[d] water infiltration."

---

ponding on the roof. So I call that water weight related damage, not quote, unquote, wear and tear."

[4] And again, OLM does not address this policy provision in its brief.

-13-

No. 19-1994, *O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*

This "Leakage Limitation" provision has its own unique exceptions that preserve coverage in some circumstances. First, subsection (b) doesn't apply here because no snow, sleet, or ice was present on the roof. Second, this limitation is not modified by an ensuing-loss clause, but subsection (a) is somewhat similar to one. Instead of requiring that an excluded cause of loss lead to a covered one, however, it requires that a covered cause of loss lead to the rain (etc.) damaging the interior of the building. This exception does not apply here because both causes of the damage to the roof "through which the rain . . . enter[ed]"—negligent design of the drain and wear and tear to the roof itself—are excluded causes of loss under the Policy. The district court was correct to conclude that the Leakage Limitation "applies and precludes coverage for damage to the interior of the building because it did not first sustain damage by a Covered Cause of Loss to its roof." *Matthews*, 412 F. Supp. 3d at 723 (brackets and internal quotation marks omitted).

### D.

"Under Michigan law, an insured loses coverage under a policy if *one* of the policy's exclusions applies to the insured's particular claims." *Seaway Cmty. Bank*, 531 F. App'x at 651 (emphasis added). The Wear and Tear Exclusion and the Leakage Limitation both apply here, and as a result, the damage to the inside of the building did not result from a "Covered Cause of Loss" under the Policy. Thus, despite the district court's error in applying the wrong causation standard to the Negligent Work Exclusion, we find that its grant of summary judgment on the basis of these other provisions was proper. *See Loftis v. United Parcel Serv., Inc.*, 342 F.3d 509, 514 (6th Cir. 2003) ("[I]n reviewing a lower court decision, we may affirm for any reason presented in the record . . . .")

### IV.

For the reasons discussed above, we affirm the district court's judgment.

-14-